# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICA FIRST LEGAL FOUNDATION, ) ) ) ) Plaintiff, ) ) v. ) ) U.S. DEPARTMENT OF ) AGRICULTURE, *et al.*, ) ) Defendants. ) ) ) | Case No. 22-cv-03029 (BAH) |

**DECLARATION OF RICHARD A. SAUBER**

I, Richard A. Sauber, declare the following to be true and correct:

1.      I am Special Counsel to the President, serving in the Office of White House Counsel.  In this capacity, I am involved in agency Freedom of Information Act ("FOIA") consultations with the White House.  When documents potentially implicate the presidential communications privilege, the White House Counsel's Office consults with relevant White House personnel to determine whether the factual predicate for an assertion of the presidential communications privilege exists.

2.      I make the statements herein on the basis of information acquired by me in the course of performing my official duties, including my review of the records at issue and information provided to me by others in the White House with personal knowledge of the underlying facts and records.

1

3.      On March 7, 2021, President Biden signed Executive Order 14019, <u>Executive Order on Promoting Access to Voting</u> as part of the Administration's efforts to "promote and defend the right to vote for all Americans who are legally entitled to participate in elections."[1] Executive Order 14019 directed federal agencies to consider ways to expand citizens' access to voter registration and election information.[2]  The Executive Order also required agency heads to submit strategic plans to the Assistant to the President for Domestic Policy within 200 days of date of the order.[3]

4.      On June 10, 2022, Plaintiff America First Legal Foundation submitted a FOIA request to each Defendant in this case, requesting a copy of the strategic plan that the agency had submitted to the White House pursuant to Executive Order 14019.

5.      I understand that each Defendant has located the responsive record and has withheld it in full under FOIA Exemption 5 based on the presidential communications privilege.

6.      This declaration addresses the basis for the Exemption 5 withholdings pursuant to the presidential communications privilege along with a description of the reasonably foreseeable harm that would result from disclosure of the information.

Executive Order 14019 and the Strategic Plans

7.      Executive Order 14019 directed agency heads to submit their strategic plans to the Assistant to the President for Domestic Policy, who was at the time and remains currently Ambassador Susan E. Rice.  Ambassador Rice also serves as head of the Domestic Policy Council ("DPC") within the White House, which drives the formulation and implementation of

---

[1] *See* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/03/07/executive-order-on-promoting-access-to-voting/
[2] *Id.*
[3] *Id.*

the President's domestic policy agenda, including advice on voting rights matters.[4]  Agencies'
strategic plans were solicited by the White House to inform future policy developments on
voting access and to assist DPC – including the head of DPC – in formulating advice to the
President on voting matters.  Upon receipt of the agency strategic plans, DPC reviewed the
plans, and DPC used information from the plans in briefing and advising the President on voting
rights and voting access issues.

8.     The agency strategic plans solicited and received by the White House described
potential agency actions for consideration, including potential timelines, budget impacts, and
possible obstacles and ways to address them.  To facilitate the discussions and identify priority
actions for agency consideration, the White House provided agencies with a template for use in
formulating their strategic plans.  The White House template identified eight categories for
potential agency action regarding voting rights and solicited proposed actions from agencies,
asking the agencies to specify which agency components would be involved in the potential
actions, the proposed timeframe for implementation, and budgetary and other considerations.
The template made clear that "[l]isting an action in this strategic plan does not commit your
agency to implementing the action" and stated that "most agencies will pursue additional
actions not listed in this plan."

### Exemption 5:  Presidential Communications Privilege

*Inter-/Intra-Agency Threshold*

9.     In order to withhold records or information from release pursuant to Exemption 5
of the FOIA, they must be inter- or intra-agency records.  Here, the agency strategic plans were

---

[4] White House, "Domestic Policy Council: About the Director Susan E. Rice," *available at*
*https://www.whitehouse.gov/dpc/about-the-director/#:~:text=Ambassador%*
*20Susan%20E.,to%20health%20care%20and%20immigration*

documents generated within each Defendant agency and sent to the White House and therefore satisfy this threshold of the exemption.

*Presidential Communications*

10.     I understand that each Defendant has withheld its strategic plan, as submitted to the White House, in full under Exemption 5 based on the presidential communications privilege.[5]

11.     Pursuant to Executive Order 14019, each Defendant was directed to submit a strategic plan to the Assistant to the President for Domestic Policy in September 2021.  After receipt of the plans, the White House had further discussions with the Defendant agencies regarding the content of their plans and to discuss the agencies' potential plans for implementation, and some of these discussions remain ongoing.  The White House solicited the strategic plans in order to inform future policy developments on voting access and to assist the DPC in formulating advice to give to the President in this area.

12.     The strategic plans of each Defendant were submitted to the White House, and reviewed by members of Ambassador Rice's staff who, as described above, compiled information from the agency strategic plans for Ambassador Rice's use in White House policy formulation and in briefing the President.  Through this process, senior White House advisors relied on the strategic plans in formulating advice to the President and creating briefing materials for him.  This advice, in turn, informed the President on the extent of agency actions and proposals on relevant voting matters and on areas where further Executive Branch action might be needed or considered within the scope of the President's executive authority.

_____

[5] As noted in the declarations from the individual agencies, some Defendants have made additional and largely overlapping withholdings under Exemption 5, and one Defendant made unrelated withholdings to pages attached to but not part of its strategic plan under Exemption 6.

Accordingly, the strategic plans fall squarely within the presidential communications privilege encompassed by FOIA Exemption 5.

*Foreseeable Harm*

13.     The FOIA provides that agencies shall withhold information "only if . . .the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in [the statute] . . ." 5 U.S.C. § 552(a)(8)(A)(i).   The presidential communications privilege exists, as recognized by the Supreme Court and multiple appellate courts, to protect the President and his advisors' abilities to engage in effective communications and decisionmaking.   In order to discharge his duties under Article II of the Constitution, the President must be able to receive confidential advice of all kinds, from a variety of sources. If such communications are forced to be disclosed, Presidents and their advisors will be unable to confidently engage in confidential decisionmaking without fear that their deliberations will be open to public view.   Candid discussions will naturally be chilled or inhibited, and the efficiency of government policymaking would suffer.

14.     In this case, there is reasonably foreseeable harm in the release of Defendants' strategic plans, given the detriment to White House and inter-agency collaboration and decisionmaking that would result if they were to be disclosed.   The release of the plans would impose a chilling effect on presidential decisionmaking, as it would hinder the ability of the President and senior presidential advisors to obtain frank, unfettered information and advice from Defendants and other Executive Branch agencies on important policy issues such as voting access.   The quality of the presidential decisionmaking process would be damaged if Defendants cannot focus solely on providing comprehensive and candid information to the White House; but rather, must evaluate advice and information through the lens of potential

5

public release.  If agencies believe that the information given to the White House will be released to the public, the quality and candor of their advice and information will be chilled.

15.     Additionally, releasing pre-decisional information would impair the integrity of the presidential decisionmaking process.  Disclosing information sought by, and conveyed to, the White House would hinder candid Executive Branch collaboration by creating a chilling effect on future White House communications, given that it would reveal the information sought and obtained by the White House in the context of presidential decisionmaking.  More specifically, the President's ability to receive candid and informed opinions would be impaired, because his DPC advisors would not be able to obtain the comprehensive information they need from agencies in order to inform policy recommendations to the President and to drive formulation and implementation of the President's policy agenda on voting rights and access issues.  This chilling effect would undermine the quality of presidential decision-making.

16.     Furthermore, disclosure of the agency strategic plans for implementation of the Executive Order would lead to public confusion about whether information considered by the President and his senior advisors actually reflects the President's voting access policies and positions.  Given that many of Defendants' strategic plans contain goals and contemplated future actions that may be taken pursuant to the Executive Order, there is substantial potential for these propositions to be inaccurately construed by the public as future commitments, past actions, or provisions already in place.  Were the strategic plans to be released, agencies providing advice or information to the President or senior presidential advisors in the future would be deterred from providing a full range of options, plans, or propositions for future potential actions out of concern for creating such public confusion.  As a result, the ability of the White House to collaborate fully with government agencies on matters of presidential

decisionmaking would be significantly hindered.  Given the aforementioned considerations, based on my review of the information at issue and my discussions with knowledgeable personnel, I have determined that there is reasonably foreseeable harm as to the disclosure of information protected by the presidential communications privilege.

*Segregation of Non-Exempt Information*

17.     Because the presidential communications privilege covers communications in their entirety, there is no reasonably segregable, non-exempt information within Defendants' strategic plans that were submitted to the White House.  As such, Defendants have withheld their strategic plans in full.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

Richard A. Sauber
Special Counsel

Executed this 11th day of January, 2023.