## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICA FIRST LEGAL FOUNDATION, ) | |
| ) | |
| *Plaintiff,* ) | Case No. 22-cv-3029 (BAH) |
| ) | |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF AGRICULTURE, *et* ) | |
| *al.* ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## PLAINTIFF'S OPPOSITION TO THE DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Gene P. Hamilton (D.C. Bar No. 1619548)
Reed D. Rubinstein (D.C. Bar No. 400153)
Michael Ding (D.C. Bar No. 1027252)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue S.E.
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org
Reed.Rubinstein@aflegal.org
Michael.Ding@aflegal.org
*Counsel for America First Legal Foundation*

March 22, 2023

## INTRODUCTION

The Freedom of Information Act's vital purpose is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). "Full agency disclosure" is the Act's directive. *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 754 (1989) citing *Department of Air Force v. Rose,* 425 U.S. 352, 360 (1976) (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)).

This case is about the government's calculated attempt to keep Americans in the dark by vastly expanding the scope of the presidential communications privilege. According to the Defendants, when the President publicly directs agencies to act on a controversial issue and report back, and those agencies then submit their reports describing what they have *actually done*, a veil of secrecy lowers, preventing citizens from knowing what the agencies reported. This contradicts the rule that the "presidential communications privilege should *never* serve as a means of shielding information regarding governmental operations that do not call ultimately for *direct* decisionmaking by the President." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (emphasis added).

In 2021, President Biden issued an executive order directing agencies to promote voter registration and access and to report back to the White House. Some agencies reported only final agency actions. The Department of State, for example, submitted a "final report regarding implementation." ECF No. 21-12. Other agencies reported both final actions and offered proposals for consideration.

America First Legal Foundation ("America First Legal") filed Freedom of Information Act requests for these reports. The Defendants, however, now claim that *all* the reports are *entirely* subject to the presidential communications privilege. This cannot be correct. Reports that respond

to a public request from the President by simply describing completed agency actions reveal nothing about any confidential and direct presidential decisionmaking. Instead, they lie at the core of what the privilege does not cover: "information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752.

The government's theories for expanding the privilege are meritless.

*First*, the government claims that advisors used the reports to brief the President *after* the reports arrived at the White House. But such use is not a talisman that transforms agency reports on government operations into confidential and direct presidential decisionmaking. If it were, the government could make secret all sorts of agency records merely by claiming that some presidential advisor has looked at them and purportedly talked about them with the President. This would end-run the Freedom of Information Act by allowing agencies to develop a whole body of final policies implementing a presidential order and keep them secret for all perpetuity.

This court has previously rejected using the presidential communications privilege to create "secret law." *Center for Effective Government v. Dep't of State*, 7 F. Supp. 3d 16, 29 (D.D.C. 2013). It should do so again here.

*Second*, the government claims that "many" of the reports, ECF No. 21-2 ¶ 16, included *proposals* and that because the presidential communications privilege applies to entire documents, if there is there anything deliberative in a report, then all final actions in the same report can be kept secret. This is also wrong. The principle that the presidential communications privilege applies to entire documents was developed merely to distinguish that privilege from the deliberative process privilege and to ensure that *facts* embedded in an otherwise privileged document would not have to be parsed out. It has never been used to ride roughshod over the core

command that the privilege can "never" be used to make secret "information regarding governmental operations," *In re Sealed Case*, 121 F.3d at 752.

*Third*, the Defendants do not show foreseeable harm from disclosing final agency actions. Disclosing existing government operations does not threaten the President's ability to receive candid advice. In fact, in describing foreseeable harm, the government's declarations focus solely on potential harm from disclosing advice and proposals. They do not even attempt to explain how disclosing final actions implementing the President's order could compromise any confidential and direct decisionmaking process. Nor could they, for agency records describing final actions reveal nothing about any such process.

No court has ever endorsed the radical expansion of the presidential communications privilege that the Defendants propose here. This Court should deny their motion for summary judgment.

## BACKGROUND

### A.     President Biden Issues Executive Order 14019 Directing Federal Departments and Agencies to Take Actions to Promote Access to Voting.

On March 7, 2021, President Biden issued Executive Order 14019, Exec. Order No. 14,019, *Promoting Access to Voting*, 86 Fed. Reg. 13,623 (Mar. 7, 2021) ("Voting Order"). The Order provides that "Executive departments and agencies should partner with State, local, Tribal, and territorial election officials to protect and promote the exercise of the right to vote, eliminate discrimination and other barriers to voting, and expand access to voter registration and accurate election information." *Id.* at 13,623. It directs "[t]he head of each agency [to] evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation." *Id.* It instructs each agency to consider actions it could take to promote voter registration and access to voting, including ways the agency can "provide relevant

information … about how to register to vote," "ways to facilitate seamless transition from agencies' websites directly to State online voter registration systems or appropriate Federal websites," and "ways to provide access to voter registration services and vote-by-mail ballot applications in the course of activities or services that directly engage with the public." *Id.* at 13,623-24.

Finally, it directs that "[w]ithin 200 days of the date of [the] order, the head of each agency shall submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified under this review that the agency can promote voter registration and voter participation." *Id.* at 13,624. The Order contains no indication that agency reports will be used for future confidential and direct Presidential decisionmaking or otherwise suggests that agencies should wait for further instruction before acting.

### B. Federal Agencies Submit Reports to the White House Detailing Both Actions They Have Already Taken to Implement the Voting Order and Potential Actions They May Take in the Future.

As instructed, the Defendants submitted reports to the Assistant to the President for Domestic Policy, Ambassador Susan Rice. Their declarations make clear that almost every agency included in its submission a description of completed actions that the agency had *already taken* in response to the Order. Indeed, with only five exceptions, every agency acknowledges that only "portions" of its report to the White House described potential actions or ideas that remained deliberative.[1] The Defendants' evidence, therefore, is that their reports *describe completed actions that the agency had already taken*.

---

[1] *See* ECF No. 21-1 ¶ 22; ECF No. 21-3 ¶ 18; ECF No. 21-4 ¶ 14; ECF No. 21-5 ¶ 16; ECF No. 21-6 ¶ 12; ECF No. 21-7 ¶ 8; ECF No. 21-8 ¶ 11; ECF No. 21-9 ¶ 13; ECF No. 21-10 ¶ 20.

For example, the Department of Labor acknowledges that only "a small subset of information" the agency included in its report to the White House qualifies as deliberative and predecisional. ECF No. 21-7 ¶ 12. Most of the report describes actions that the agency has already taken. Similarly, the Treasury Department explains that only "portions" of its submission reveal predecisional deliberations. ECF No. 21-9 at ¶ 13. And the Department of Veterans Affairs explains that only certain "portions" of its submission "contain potential ideas that had not yet been decided upon at the time the Plan was submitted to the White House and still have not been decided upon or implemented." ECF No. 21-10 ¶ 20. The necessary implication from this carefully limited statement is that the rest of the report reflects (in the VA's words) policies that *had been* "decided upon or implemented" when the report was submitted to the White House.

Three agencies do not claim that their reports describe anything predecisional. *See* ECF Nos. 21-12 (Department of State), 21-14 (Department of Energy), 21-15 (Environmental Protection Agency). Instead, they concede that their reports describe *only* final decisions or completed actions. *See* ECF No. 21-12 ¶ 7.

Finally, only one agency, the Department of Housing and Urban Development, claims its *entire* report is predecisional. *See* ECF No. 21-11 ¶¶ 15, 20. It states that this report "did not summarize what [the Department] would in fact implement or what had been implemented, but rather listed proposals that could be implemented"; that "[t]he proposed actions had not been finalized or implemented before or at the time the plan was submitted to the White House"; and that "[n]one of the proposals were incorporated or adopted as a final decision or policy." *Id.* at ¶ 20. No other agency has made similar claims.[2]

_____

[2] The Department of Health and Human Services states that its "Plan identified several potential actions the Department could take to promote access to voting." ECF No. 21-13 ¶ 14. Although the agency's potential actions may not have been taken at the time the report was submitted, the

**C.      The White House Claims Presidential Communications Privilege Over the Entirety of Every Agency's Submission.**

America First Legal submitted a Freedom of Information Act (FOIA) request to each Defendant agency for its Voting Order report. ECF No. 21-16 ¶ 2. Several agencies responded by withholding their reports in full under FOIA Exemption 5, *id.* ¶ 3, while others initially responded not at all. *Id.* ¶¶ 4-5. America First Legal then sued for disclosure.

These reports contain information about government operations vital to the American people. The President directed every department and agency to expend taxpayer dollars on programs promoting "voter registration and voter participation." Voting Order § 3(a). Partisan political parties often carry out voter registration drives to boost the registration of groups the party believes will enhance its electoral chances. *See* Max Greenwood, *GOP rolls out voter registration push at gas stations*, THE HILL (Mar. 22, 2022, 10:27 AM), http://bit.ly/3n8RvXL; Tal Axelrod, *Democrats unveil $5M voter registration campaign,* THE HILL (Sept. 29, 2021, 10:15 AM), http://bit.ly/3LBRSUZ. Similarly, "voter participation" campaigns are inherently partisan. *See* Jeff Amy, *In Georgia, campaigns look to drive turnout with a knock*, ASSOCIATED PRESS (Nov. 3, 2022), http://bit.ly/3LHtdOK. The agencies have acknowledged that any actions involving "policies relating to voting access" raise "potentially polarizing public topics." ECF 21-7 ¶ 19, and that "voting access issues" are an "often-controversial topic." ECF No. 21-4 ¶ 15. Therefore, using taxpayer dollars for such activities raises obvious questions about unlawful partisanship and Anti-Deficiency Act violations. *See* 31 U.S.C. § 1341(a)(1)(A).

The Defendants now claim that every agency's report should be kept secret because of the presidential communications privilege. *See* ECF No. 21-2 ¶¶ 11-12. Special Counsel to the

---

agency has not averred those actions remain predecisional *today,* as the Department of Housing and Urban Development has done. Therefore, it is unclear whether the Department of Health and Human Services has made a final decision and implemented the actions it proposed.

President, Richard A. Sauber, justifies the secrecy on the grounds that the "White House solicited the strategic plans in order to inform future policy developments on voting access and to assist the [Domestic Policy Council] in formulating advice to give to the President in this area." ECF No. 21-2 ¶ 11. Mr. Sauber does not point to any language in the Voting Order explaining that this was the intended purpose of the submissions. Instead, he states that the reports were "reviewed by members of Ambassador Rice's staff who . . . compiled information from the agency strategic plans for Ambassador Rice's use in White House policy formulation and in briefing the President." *Id.* ¶ 12. He also states that unnamed "senior White House advisors relied on the strategic plans in formulating advice to the President and creating briefing materials for him." *Id.* Oddly, Mr. Sauber does not explain how any actions *already taken* by an agency could be related to any actual or potential confidential and direct presidential decision.

Each agency declaration explains that the basis for secrecy is "the rationale articulated in the declaration of Richard A. Sauber."[3] Nine declarations assert that "portions" of the report submitted by the relevant agency describe proposals or ideas that have not been adopted and remain deliberative, subject to Exemption 5 withholding.[4] Nearly every agency asserting that there are deliberative portions to its submission to the White House has also made a statement similar to the Department of Transportation's assertion that "[b]ecause the presidential communications prong of FOIA Exemption 5 exempts records from disclosure in their entirety, no segregability

---

[3] *See, e.g.,* ECF No. 21-1 ¶ 1; ECF No. 21-3 ¶ 16; ECF No. 21-4 ¶ 11; ECF No. 21-5 ¶ 12; ECF No. 21-6 ¶ 10; ECF No. 21-7 ¶ 11; ECF No. 21-8 ¶ 9; ECF No. 21-9 ¶ 11; ECF No. 21-10 ¶ 17; ECF No. 21-11 ¶ 19; ECF No. 21-12 ¶ 18; ECF No. 21-13 ¶ 20; ECF No. 21-14 ¶ 13; ECF No. 21-15 ¶ 15.

[4] *See* ECF No. 21-1 ¶ 17; ECF No. 21-3 ¶ 18; ECF No. 21-4 ¶ 14; ECF No. 21-5 ¶ 16; ECF No. 21-6 ¶ 12; ECF No. 21-7 ¶ 12; ECF No. 21-8 ¶ 11; ECF No. 21-9 ¶ 13; ECF No. 21-10 ¶ 20.

analysis is necessary." ECF No. 21-8 ¶ 10.[5] In other words, those agencies have acknowledged that their assertion of deliberative process privilege would protect only "portions" of the reports they submitted to the White House. However, they claim that the reports can be withheld entirely because the presidential communications privilege applies to the whole record.

## STANDARD OF REVIEW

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Robbins*, 437 U.S. at 242. The congressional objective is "full agency disclosure" to pierce the veil of administrative secrecy and "to open agency action to the light of public scrutiny." *Rose,* 425 U.S. at 360–61 (citations omitted). Therefore, FOIA "mandates the disclosure of documents held by a federal agency unless the documents fall within one of [the statute's] nine enumerated exemptions." *United States Fish & Wildlife Service v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).

Summary judgment for the government in a FOIA case is appropriate only where the government "proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Media Rsch. Ctr. v. U.S. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011). Courts review agency determinations *de novo*, *Houser v. U.S. Dep't of Health & Human Servs.*, 270 F. Supp. 3d 237, 240 (D.D.C. 2017), and "should narrowly construe the statutory exemptions when determining if records requested under the FOIA should be disclosed." *Judicial Watch, Inc.*

---

[5] *See also* ECF No. 21-1 ¶ 26; ECF No. 21-3 ¶ 22; ECF No. 21-4 ¶ 16; ECF No. 21-5 ¶ 20; ECF No. 21-6 ¶ 20; ECF No. 21-7 ¶ 22; ECF No. 21-9 ¶ 22; ECF No. 21-11 ¶ 27.

*v. Nat'l Archives & Recs. Admin.*, 214 F. Supp. 3d 43, 51 (D.D.C. 2016), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017).

An agency asserting that a document may be withheld under a FOIA exemption bears the burden of establishing the applicability of the claimed exemption. 5 U.S.C. § 552(a)(4)(B). Although an agency can carry that burden "by affidavit," *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009), summary judgment for the agency is warranted only where "the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Id.*

## ARGUMENT

**I.    The presidential communications privilege exists to protect confidential direct Presidential decisionmaking, not to veil existing government operations in secrecy.**

The presidential communications privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008). It is grounded in the insight that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also id.* at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."). It is thus designed to "ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *In re Sealed Case*, 121 F.3d at 750.

Accordingly, the "scope of the presidential communications privilege is . . . defined in

terms of communications that involve the Office of the President, the exercise of the President's responsibilities, and confidential presidential decisionmaking." *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1110 (D.C. Cir. 2019). The privilege is thus justified and delimited by the principle of protecting a confidential decisionmaking process. As a result, the D.C. Circuit has warned that the privilege "should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752.

What the presidential communications privilege is *not* designed to do is to allow the White House to keep secret government actions in departments and agencies outside the White House that have already been implemented based on public directives from the President. Thus, the D.C. Circuit has expressly warned that "[t]he presidential communications privilege should *never* serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752 (emphasis added). Indeed, that restriction has been recognized as "the key limiting principle" on the privilege. *Cause of Action Inst. v. U.S. Dep't of Com.*, No. 19-CV-2698 (DLF), 2022 WL 4130813, at *6 (D.D.C. Sept. 12, 2022). The D.C. Circuit has particularly cautioned against readily extending the privilege to "staff outside the White House in executive branch agencies," and to officials who have "dual hat" responsibilities that may involve advising the President at times but that also involve "exercis[ing] substantial independent authority" over government operations and who "thus are subject to FOIA and other open government statutes." *In re Sealed Case*, 121 F.3d at 752.

Distorting the privilege to shroud in secrecy ongoing government operations that such officials have already decided upon would run headlong into the "very purpose of FOIA," which is designed to prevent the government from establishing a body of "secret law." *Center for*

*Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 29 (D.D.C. 2013); *see also Schwartz v. IRS*, 511 F.2d 1303, 1305 (D.C. Cir. 1975) (explaining that Exemption 5 does not apply to "deliberative policies, statements or interpretations of law that the agency has actually adopted to prevent bodies of 'secret law' from being built up and applied by government agencies") (cleaned up).[6]

Here, the Court should deny the government's motion for summary judgment because the government is trying to invoke the presidential communications privilege exactly how *In re Sealed Case* said it should *never* be used—namely, to shield from public view actual operations of the government. It is being asserted to shield reports of agencies' actions to implement a past public presidential directive. But such statements of policy "which have been adopted by the agency" are precisely the type of documents that, under FOIA, each agency must make public. 5 U.S.C. § 552(a)(2)(B). Disclosing what agencies have already done in response to the President's past directives in no way imperils the confidentiality of direct presidential decisionmaking. Accordingly, the privilege cannot be used to foreclose disclosure.

The Defendants' various secrecy rationales are meritless. First, the agencies cannot keep secret reports or portions that describe final agency policies and actions simply by asserting that, after arriving at the White House, presidential advisors purportedly used them (in some non-specific, unknown way) to formulate advice for the President. Second, applying the presidential communications privilege to an entire record cannot justify keeping otherwise segregable and disclosable government operations secret because these operations are combined in a single record with predecisional proposals or suggestions. Third, the Defendants fail to show any foreseeable harm by disclosing the final actions agencies have taken or policies they have adopted.

---

[6] *Accord Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 713 (D.C. Cir. 1971) (Bazelon, C.J., concurring in part and dissenting in part) (Congress "indicated unequivocally that the purpose of [FOIA] was to forbid secret law").

A.    **Compiling unspecified "information" for "policy formulation" and "briefing the President" from an agency report of final or completed actions does not make the entire report privileged.**

The Defendants assert that staff members "'compiled information from the agency strategic plans for Ambassador Rice's use in White House policy formulation and in briefing the President.'" Br. at 13 (quoting ECF No. 21-2 ¶ 12).[7] Therefore, they claim the reports are privileged. This is nothing more than a massive end run around the core directive from *In re Sealed Case* that the presidential communications privilege "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752.

The Defendants advocate for a rule allowing the government to avoid the FOIA's transparency mandate based on the happenstance of what a presidential advisor decides to do with a record after it arrives at the White House, allowing the Executive to make secret after the fact matters that are properly subject to public disclosure. Here, the President publicly announced his decision to have agencies take action concerning voter access and registration and publicly directed agencies to report back. The agencies acted and reported back actions completed when the reports were sent or shortly after. As the Department of State explained, its submission was a "final report regarding implementation of E.O. 14019." ECF No. 21-12 ¶ 7.

These reports on final actions had nothing to do with any confidential presidential decisionmaking process. The President had already made his decisions, publicly announced them, and directed the agencies to act. And the agencies had made their decisions and implemented them. A catalog of final agency policies and actions is not "'revelatory of the President's deliberations'

---

[7] *See also id.* (quoting ECF No. 21-2 ¶ 12) (stating that "'senior White House advisors relied on the strategic plans in formulating advice to the President and creating briefing materials for him'").

such that [their] public disclosure would undermine future decisionmaking." *Center for Effective Gov't*, 7 F. Supp. 3d at 25 (quoting *In re Sealed Case*, 121 F.3d at 745). Rather, it is exactly what *cannot* be covered by the presidential communications privilege: "information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752.

The Defendants' approach is dangerously novel. For example, if the President publicly directed the Department of Justice to report how many felony prosecutions it had completed in the last year and the Department provided a table with those numbers, then—under the theory advanced in this case—the table suddenly becomes secret if someone uses it to advise the President.

Worse, as in this case, after the President publicly directs agencies to take action on a controversial issue and report back, he could keep secret the bare reports describing the final policies and actions the agencies have undertaken simply by positing an endless feedback loop in which all actions that are taken to implement the President's order may be considered by presidential advisors to formulate advice to the President on future actions—so everything that agencies have already done is perpetually held within the secrecy of a purportedly ongoing confidential presidential decisionmaking process.[8] Thus, the Executive could gut FOIA and create an entire body of agency records perpetually shielded from public view—precisely the sort of

---

[8] There is rarely discovery taken of agency declarants or White House advisors in FOIA cases. But in the face of the sort of generalized incantations of presidential communications privilege offered up in this case, it is hard to see how a court could effectively conduct *de novo* review and properly assess the application of the privilege to a given record without deposition testimony from both the declarant and the White House officials who supposedly provided the relevant advice and counsel to the President.

"secret law" that FOIA prohibits. *Tax Analysts & Advocs. v. Internal Revenue Serv.*, 505 F.2d 350, 353 (D.C. Cir. 1974).

The Defendants' sweeping secrecy theory parallels the government claim that was soundly rejected in *Center for Effective Government v. Dep't of State*, 7 F. Supp. 3d 16 (D.D.C. 2013). That case involved a final presidential directive that had been widely distributed throughout the Executive Branch and that ordered several agencies to act. The government claimed that the order should be kept secret under the presidential communications privilege simply because it was a communication that came from the President. *See id.* at 24. The court rightly excoriated the government's "cavalier attitude" towards implementing a system under which final presidential orders disseminated throughout the Executive Branch should govern agency conduct "without public oversight," thereby allowing the government "to engage in what is in effect governance by 'secret law.'" *Id.* at 29. It recognized that "[s]uch a position conflicts with the very purpose of FOIA." *Id.*

While *Effective Democracy* involved efforts to keep a final presidential directive secret, this case involves a conceptually similar effort to keep the final agency actions implementing a public presidential directive secret. And the court's rationale for rejecting the government's theory applies equally here. The agency reports of policies and actions implementing the Voting Order are quintessential examples of "information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752. The presidential communications privilege should never be used to keep such information secret. *Id.*

**B.      The "entire-document" principle should not be used to create secret law by veiling final agency policies and actions from public disclosure and scrutiny.**

The Defendants' second justification for keeping secret the final agency policies and actions taken to implement the Voting Order is that at least some agencies[9] reported in documents that also described predecisional proposals for further White House consideration. They argue that by including even one predecisional proposal in the report, the entire record becomes secret, cutting off from public scrutiny the government operations it describes. *See, e.g.*, ECF No. 21-1 ¶ 26 ("With respect to the Draft Plan, because the presidential communications privilege covers this document in its entirety, there are no reasonably segregable, non-exempt portions within the Draft Plan that can be released under the deliberative process privilege without compromising information that is protected pursuant to the presidential communications privilege."). But no court has endorsed using this "entire-document" approach in comparable circumstances, and it cannot remotely be justified based on the principles that define the proper scope of the privilege.

The D.C. Circuit has indeed said, "the presidential communications privilege applies to documents in their entirety," *In re Sealed Case*, 121 F.3d at 745. But the entire-document approach is not an iron rule. The D.C. Circuit has also said that there is a risk that "an entire-document rule might allow the government to incorporate materials covered by the privilege into a document that would not otherwise be [privileged], thus improperly shielding the latter from FOIA." *Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 888 (D.C. Cir. 2021). The Circuit has

---

[9] As noted, four agencies have not claimed that their reports included any predecisional proposals, conceding that they contained only final decisions, policies, and actions. The government cannot rely on the principle that the presidential communications privilege applies to an entire document to withhold those four reports on the theory that, in part, they provide advice or proposals for future actions. Instead, the government must rely solely on its theory that the privilege applies because some advisor to the President used the reports of existing governmental operations to formulate *other* advice for the President. That is incorrect, as explained above.

at least suggested that, in a case showing evidence of "such tail-wagging-dog abuse of the privilege," the privilege should not apply. *Id.*

To begin with, this is such a case. The agencies' declarations prove that nearly all the subject reports describe final or completed agency policies and actions in whole or part; these final or completed policies and actions have nothing to do with subsequent, confidential, and direct presidential decisionmaking. *See* ECF No. 21-7 ¶ 12; No. 21-9 ¶ 15. Furthermore, the "entire-document rule" is not directly grounded in the Constitution. It was a practice announced by the D.C. Circuit in dicta in *In re Sealed Case* based on a limited inference derived from language in *United States v. Nixon*, 418 U.S. 183 (1974).

In *Nixon*, the Supreme Court noted that the privilege must be qualified to permit access to facts in criminal cases, *see id.* at 709, and the D.C. Circuit extrapolated from that statement the principle that "unlike the deliberative process privilege," the presidential communications privilege must cover "factual material" included in a privileged communication—so that such factual material would not have to be parsed out. *In re Sealed Case*, 121 F.3d at 745. In context, the court clearly believed that such factual material could potentially be "revelatory" of the President's confidential deliberations, *id.; see also id.* at 750-51. Thus, the entire-document principle announced in *In re Sealed Case* remained firmly grounded in the rationale undergirding the privilege—namely, protecting confidential presidential decisionmaking.

The limited principle described in *In re Sealed Case*, of course, has nothing to do with the uncabined assertion that an agency can take a report containing a catalog of final agency policies and actions made in response to a published Executive Order—which would *not* be subject to the privilege—and make it secret by including one recommendation for the President. *In re Sealed Case* itself made clear that because the privilege solely protects confidential direct presidential

decisionmaking processes, it *cannot* be used to keep secret "information regarding governmental operations." 121 F.3d at 752. In fact, no court has *ever* applied the entire-document principle in the extraordinary fashion the government advocates here.

Even assuming, *arguendo*, that the government's unprecedented expansion of the entire-document principle could be reconciled with the privilege's rationale, the best that can be said for the government's approach is that it presents a tension between two different statements from *In re Sealed Case.* On the one hand, the court announced in dicta a judicially created rule applying the privilege to entire documents (a rule that was originally designed for the limited purpose of protecting factual material included in a communication). On the other hand, the Circuit announced the imperative command that the privilege "should *never* serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752 (emphasis added). And other courts have recognized that latter command as "the key limiting principle" on the privilege. *Cause of Action Inst. v. U.S. Dep't of Com.*, No. 19-CV-2698 (DLF), 2022 WL 4130813, at *6 (D.D.C. Sept. 12, 2022).

Where there is a tension between those two statements, it is obvious which one the Court should follow. The entire-document principle announced in dicta to avoid the need to parse out facts from a presidential communication should not be used to accomplish the one thing that *In re Sealed Case* expressly directed that the privilege should "never" be used for—keeping otherwise unclassified government operations secret from the American people. And this Court certainly should not become the first to allow the government to exploit the entire-document approach to undermine FOIA and keep government operations secret.

C.      **The Defendants cannot demonstrate foreseeable harm.**

At least concerning the sections of the reports describing final or completed agency policies and actions, the Defendants fail to show how FOIA compliance will foreseeable harm the interests protected by the presidential communications privilege.

It is settled law that the requirement to demonstrate foreseeable harm from disclosure "imposes an independent and meaningful burden on agencies by which the agency must identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect the harms in a meaningful way to the information withheld." *Center for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (Howell, C.J.) (cleaned up). In addition, although agencies may use a "categorical approach" and "group together like records," they must "provide more than nearly identical boilerplate statements and generic and nebulous articulations of harm." *Id.* (cleaned up).

As the Defendants concede, Br. 12, the foreseeable harm requirement applies when the presidential communications privilege is used as the basis for withholding documents under FOIA. *See New York Times Co. v. OMB*, 531 F. Supp. 3d 118, 129–30 (D.D.C. 2021) (finding that while certain e-mail attachments "technically fall within the ambit of the [presidential communications] privilege, the Court is unable to discern the basis for a conclusion that it is reasonably foreseeable that the release of those records in particular would harm the interests intended to be protected by the privilege")

The Defendants do not explain how disclosing the four agency reports that describe only *completed* actions, or the portions of the other agency reports describing such actions, could possibly harm confidential direct presidential decisionmaking. Their declarations never specifically address that question all. The declarations from the four agencies that reported only

18

final decisions and completed actions do not mention foreseeable harm. Instead, they cross-reference Mr. Sauber's declaration. *See* ECF No. 21-12 ¶ 18; ECF No. 21-13 ¶ 20; ECF No. 21-14 ¶ 13; ECF No. 21-15 ¶ 15. And the agencies whose reports *partly* described completed agency actions carefully limited their assertions of foreseeable harm to address solely the portions of their reports over which they claimed deliberative process privilege. The Department of Labor, for example, claimed: "there is a foreseeable harm in releasing the *portions* of the Strategic Plan that present ideas not yet decided upon or implemented." ECF No. 21-7 ¶ 20 (emphasis added).[10] As for any claim about harm from releasing the remainder of their reports—the parts that described what the agencies had already done—these agencies also rely solely on a cross-reference to Mr. Sauber's declaration.[11]

Mr. Sauber, in turn, never squarely addresses how releasing the reports or portions of reports cataloging completed agency actions causes any cognizable harm to confidential presidential decisionmaking. Instead, he invokes insufficient "generic" and "boilerplate" statements, *see, e.g.*, *Center for Investigative Reporting*, 436 F. Supp. 3d at 106—for example, broadly asserting that disclosing anything would "impair 'the ability of the President and senior presidential advisors to obtain frank, unfettered information and advice from Defendants and other Executive Branch agencies." Br. 15 (quoting ECF No. 2115-2 ¶ 14). But his references to disclosing and thereby chilling "advice" are irrelevant. America First Legal does not seek the release of advice. And Mr. Sauber nowhere explains how releasing "information" about actual

---

[10] *See also* ECF No. 21-1 ¶ 22; ECF No. 21-3 ¶ 20; ECF No. 21-4 ¶ 14; ECF No. 21-5 ¶¶ 17-18; ECF No. 21-6 ¶¶ 17-19; ECF No. 21-8 ¶ 13; ECF No. 21-9 ¶¶ 17-21; ECF no. 21-10 ¶¶ 21-22.

[11] *See* ECF No. 21-1 ¶ 15; ECF No. 21-3 ¶ 16; ECF No. 21-4 ¶ 11; ECF No. 21-5 ¶ 12; ECF No. 21-6 ¶ 10; ECF No. 21-7 ¶11; ECF No. 21-8 ¶ 9; ECF No. 21-9 ¶ 11; ECF No. 21-10 ¶ 17.

agency policies that have already been implemented could possibly have any impact on confidential presidential decisionmaking.

Mr. Sauber fares no better in suggesting that "[i]f the strategic plans were disclosed, federal agency employees would have to 'evaluate advice and information' they were providing to the President and his advisors in the future 'through the lens of potential public release,' which would impair their ability to 'focus solely on providing comprehensive and candid information to the White House.'" *Id.* (quoting ECF No. 21-2 ¶ 14). Again, the references to disclosing, and thereby chilling, "advice" are beside the point. America First Legal seeks information about existing governmental operations and completed agency actions. And all agency officials *should* act with the knowledge that agency *actions* will become public (unless some other FOIA exemption covers them). Indeed, FOIA commands that each agency "shall make available for public inspection" such "statements of policy" that have been "adopted by the agency." 5 U.S.C. § 552(a)(2)(B). It seems Mr. Sauber intends to suggest that when the President publicly calls for agencies to report how they have implemented a presidential directive, he renders secret actual agency operations otherwise subject to public disclosure. This cannot be correct.

Finally, Mr. Sauber claims that disclosing the agency reports would cause "public confusion" about what "actually reflects the President's voting access policies and positions." ECF No.21-1 ¶ 16. But once again, that rationale logically applies (if at all) only to predecisional proposals, not actions that have already been decided upon or implemented. Indeed, Mr. Sauber tacitly acknowledges that point as he supports his claim of potential confusion by noting that "many of Defendants' strategic plans contain goals and contemplated future actions." ECF No. 21-2 ¶ 16. But while "many" of the reports include "contemplated future actions," not *all* of them do, and thus this rationale cannot justify withholding them.

Contrary to FOIA, the government is trying very hard to keep *secret* the President's *actual* voting access policies and positions—as they have been concretely implemented by Executive Branch agencies pursuant to the President's public directive. The only purported "harm" that would result from releasing that information is that it would allow the American people to know what their government is actually up to. And that is not a cognizable harm under either FOIA or the presidential communications privilege. The government has failed to show any legitimate foreseeable harm, and the Court should reject the government's motion.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's Motion for Summary Judgment.

Date: March 22, 2023

Respectfully submitted,

/s/  *Michael Ding*
Gene P. Hamilton (D.C. Bar No. 1619548)
Reed D. Rubinstein (D.C. Bar No. 400153)
Michael Ding (D.C. Bar No. 1027252)
America First Legal Foundation
611 Pennsylvania Ave., S.E., No. 231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org
Reed.Rubinstein@aflegal.org
Michael.Ding@aflegal.org
*Counsel for America First Legal Foundation*