**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICA FIRST LEGAL FOUNDATION,<br><br>       Plaintiff,<br><br>   v.<br><br>U.S. DEPARTMENT OF AGRICULTURE,<br>*et al.*,<br><br>       Defendants. | Case No. 22-cv-3029 (BAH) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   The Strategic Plans Are Part of Direct Presidential Decisionmaking........................ 1

II.   The Presidential Communications Privilege Is Broader than the Deliberative Process Privilege. ..................................................................................................... 3

III.  Withholding the Strategic Plans Does Not Create "Secret Law." ............................ 5

IV.  Disclosing the Strategic Plans Would Impair the Presidential Decisionmaking Process ....................................................................................................................... 8

CONCLUSION.................................................................................................................... 9

In early 2021, President Biden directed federal agencies to submit a strategic plan to the White House within 200 days outlining "ways . . . the agency can . . . promote voter registration and voter participation."  Promoting Access to Voting, Exec. Order No. 14,019 § 3(a), 86 Fed. Reg. 13,623 (Mar. 7, 2021) ("EO 14019").  Plaintiff has failed to rebut Defendants' showing that, in response to Plaintiff's FOIA request, the agencies properly withheld the strategic plans in their entirety under Exemption 5, based on the presidential communications privilege.  Defs.' Mot. for Summ. J., ("Defs.' Mot.") 6–10, ECF No. 21.

Defendants also moved for summary judgment on their withholdings of the parts of the strategic plans that are predecisional and deliberative under the deliberative process privilege. Defs.' Mot. 10–14.  Plaintiff does not dispute, or even address, that some agencies properly withheld those portions of the strategic plans under that privilege.  "Where a party fails to address arguments raised by the opposing party's motion for summary judgment, the Court may treat those arguments as conceded."  *Comptel v. FCC*, 945 F. Supp. 2d 48, 55 (D.D.C. 2013); *see also Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (per curiam) (arguments abandoned when not raised in opposition to opposing party's motion for summary judgement).  At minimum, the Court should grant Defendants' motion for summary judgment with respect to withholdings under the deliberative process privilege.

## I.     The Strategic Plans Are Part of Direct Presidential Decisionmaking.

Plaintiff misunderstands the presidential decisionmaking process of which the strategic plans are part.  On March 7, 2021, President Biden issued Executive Order 14019, which required federal agencies to submit a strategic plan to the White House within 200 days explaining "ways . . . the agency can promote voter registration and voter participation" after those agencies "consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process."  EO 14019 § 3.  The President directed the agencies

to provide those plans to the Assistant to the President for Domestic Policy, Ambassador Susan Rice. *Id.* § 3(b).

The Executive Order was not a direction to agencies to enact certain policies on voting matters. *Contra* Pl.'s Opp. to Defs.' Mot. for Summ. J., ("Pl.'s Opp.") at 12–13, ECF No. 26. EO 14019 instead called for agencies to brainstorm potential actions related to voting. EO 14019 § 3. The strategic plans were to be forward-looking: agencies should identify ways the agency "*can* promote voter registration and voter participation." *See id.* § 3(b) (emphasis added). "The White House solicited the strategic plans in order to inform future policy developments on voting access and to assist the DPC in formulating advice to give to the President in this area." Decl. of Richard A. Sauber, ("Sauber Decl."), ¶ 11, ECF 21-2. President Biden's request for strategic plans from federal agencies in EO 14019 was merely one step in a series of potential future decisions on voting rights issues, which were to be informed by the information his immediate advisors received from agencies in the plans. *See* Sauber Decl. ¶¶ 7–8. While some agency strategic plans include actions already taken, EO 14019 was used to inform and facilitate the direct presidential decisionmaking process about the Administration's strategy on voting access, not to end it.

Defendants are not withholding the strategic plans "based on the happenstance of what a presidential advisor decides to do with a record after it arrives at the White House[.]" *Contra* Pl.'s Opp. 12. Those plans were expressly called for by the President, as an opening step in a process involving "direct decisionmaking by the President." *See In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). Plaintiff disputes neither that the President personally called for the strategic plans nor that senior White House officials used those plans to provide advice to the President on voting matters. *See* Pl.'s Opp. 7, 12 n.7; *see also* Sauber Decl. ¶ 12. The Court, therefore, need

not expand the scope of presidential decisionmaking to recognize that the presidential communications privilege applies.

## II. The Presidential Communications Privilege Is Broader than the Deliberative Process Privilege.

Plaintiff argues that the strategic plans are not privileged to the extent that they detail actions that agencies had already taken. Pl.'s Opp. 10. Plaintiff's position would effectively make the presidential communications privilege duplicative of the deliberative process privilege. But it is well settled that the presidential communications privilege sweeps more broadly than the deliberative process privilege. *See Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008); 26A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 5673 (1st ed.) (describing the presidential communications privilege as "more protective" than the deliberative process privilege). "The privilege covers documents reflecting 'presidential decisionmaking and deliberations,' regardless of whether the documents are predecisional or not." *Loving*, 550 F.3d at 37–38 (quoting *In re Sealed Case*, 121 F.3d at 744–45). Plaintiff's distinction between pre- and post-decisional material is inapposite to the analysis under the presidential communications privilege.

A "confidential decisionmaking process[,]" which Plaintiff acknowledges the presidential communications privilege protects, Pl.'s Opp. 10, includes providing factual information to the President. The privilege "ensure[s] that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *In re Sealed Case*, 121 F.3d at 750. "Full knowledge" for setting Administration-wide priorities on voting matters includes knowledge about agencies' existing and planned efforts in that area. This Court upheld the withholding of primarily factual information under the presidential communications privilege when it approved the government's withholding of an FBI background investigation for a presidential nominee.

3

*Buzzfeed, Inc. v. Fed. Bureau of Investigation*, 613 F. Supp. 3d 453, 470 (D.D.C. 2020). Notably, the government did not withhold that document under the deliberative process privilege as a predecisional and deliberative plan. The withholding under the presidential communications privilege was appropriate, nonetheless, because it helped provide the President with "full knowledge" as he carried out his responsibilities, namely deciding whether to proceed with a nomination. *See id.* at 467–68. Withholding under the presidential communications privilege is likewise appropriate here, where the strategic plans provide the President with both suggested future actions and factual information about agency operations in the context of his decisionmaking on Administration-wide policy.[1]

Finally, the presidential communications privilege "applies to documents in their entirety[.]" *In re Sealed Case*, 121 F.3d at 745; *see also Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1113 (D.C. Cir. 2019) ("[B]ecause the presidential communications privilege applies to the totality of the five memoranda that Judicial Watch requests . . . the question of segregability of non-exempt material is therefore not presented[.]"). The D.C. Circuit based its holding in part on "ensur[ing]" that the President had "full access to facts," and the court acknowledged the reality that "post-decisional materials" "often will be revelatory of the President's deliberations[.]" *In re Sealed Case*, 121 F.3d at 745. Plaintiff's attempt to evade the D.C. Circuit's clear statements on the inapplicability of a segregability analysis by alleging that it is "dicta" is frivolous. *See* Pl.'s Opp. 16. Tellingly, Plaintiff cites *no* court that has ever applied a segregability analysis after

---

[1] In a footnote, Plaintiff states that some agencies "conced[e]" that their plans "contained only final decisions, policies, and actions[,]" because the agencies did not claim the deliberative process privilege. Pl.'s Opp. 15 n.9. That is not so. There are a variety of reasons, including prudential considerations, why an agency may decide not to rely on a privilege to withhold information under FOIA. But in any event, appropriate application of the presidential communications privilege does not turn on whether a document would also be appropriately withheld under the deliberative process privilege.

determining that the presidential communications privilege is implicated.  For good reason: this court is bound to apply the clear statement of law from the D.C. Circuit.  *See, e.g.*, *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 22 (D.D.C. 2013) (acknowledging this legal principal).

Plaintiff's suggestion that the Court should apply a segregability analysis because Defendants are abusing the presidential communications privilege to protect documents that were not part of direct decisionmaking by the President is based on a caricature of EO 14019.  *See* Pl.'s Opp. 15–17.  The Executive Order did not direct agencies to merely report on their existing operations, nor did it direct agencies to take specific actions in secret.  Instead, EO 14019 required agencies to brainstorm various courses that they *could* take—only some of which had been or later were carried out—and to send those ideas to the President's senior advisor to allow her to advise the President.  As explained above, this is quintessential direct presidential decisionmaking, *supra* I, and Plaintiff's distortion of EO 14019 provides no basis to apply a segregability analysis to the strategic plans.

### III.    Withholding the Strategic Plans Does Not Create "Secret Law."

Plaintiff's concern that withholding the strategic plans would create "secret law" is misplaced.  Pl.'s Opp. 10–14.  The Supreme Court has developed the "working law" doctrine that requires agencies to disclose the "reasons which [supplied] the basis for an agency policy actually adopted."  *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152–53 (1975)).  "In other words, an agency is not permitted to develop a body of secret law[.]"  *Id.* (quotation marks omitted).

The strategic plans are not a body of "secret law."  It is "overly expansive" to state that "any statement that describes the agency's existing policies is working law[.]"  *Hall & Assocs. v. U.S. Env't Prot. Agency*, --- F. Supp. 3d ---, No. CV 19-330 (RDM), 2022 WL 4482569, at *15

(D.D.C. Sept. 27, 2022). When assessing whether a document represents the agency's working law such that its withholding is barred, it is "[c]rucial . . . [that the court] understand[] . . . the function of the document[] in issue in the context of the administrative process which generated [it]." *Sears*, 421 U.S. at 138, 153; *see also Hall & Assocs.*, 2022 WL 4482569, at *15 ("Correctly understood, . . . the inquiry into whether a document contains 'working law' often focuses as much on 'the function and significance of the document in the agency's decisionmaking process' as it does on the substance of the document's statements." (quoting *Tax'n With Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981))). Here, the strategic plans serve the function of informing the President's immediate advisor, Ambassador Susan Rice, about the agencies' policy ideas for supporting the voting access goals expressed in EO 14019. *See* EO 14019 § 3. EO 14019's directive that each agency develop "a strategic plan outlining the ways . . . that the agency can promote voter registration and voter participation" underscores the deliberative nature of the plans by requesting input on ways each agency "*can*" accomplish those objectives—rather than input on ways each agency *will do* or *have done* so. *Id.* The information in the strategic plans was for Ambassador Rice's use in "briefing and advising the President on voting rights and voting access issues" to inform subsequent presidential decisionmaking on voting matters. *See* Sauber Decl. ¶ 7. Therefore, "the function of the [Plans] in the context of the administrative process which generated them" was to provide information to the White House to aid in ongoing White House deliberations about potential future policymaking on voting rights and access issues. *Sears*, 421 U.S. at 138.

Concerns of "secret law" are inapplicable because the strategic plans "do not constitute or establish 'law' in the sense of setting forth a decision that binds subordinates or a regulated party. Rather, the [strategic plan] document[s are] advice given up the chain to someone (the President) . . . [to inform his future] decision[making]." *Jud. Watch*, 913 F.3d at 1113 (rejecting a working

6

law doctrine argument and affirming the application of the presidential communications privilege); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (indicating that "ideas and theories which go into the making of the law" cannot be classified as working law and are, instead, eligible for privilege protections). In other words, even if some of the policy ideas discussed in the strategic plans were decided upon and implemented, that fact would not transform the strategic plans or portions thereof into the working law of the agency. Rather, the working law doctrine instructs that the policies themselves would need to be disclosed to the public. *See Sears*, 421 U.S. at 153.

The only scenario in which a district court has limited the presidential communications privilege due to concerns about "secret law" involve final, post-decisional presidential memoranda. The strategic plans are predecisional documents designed to inform the President's later decisionmaking and therefore unlike the Presidential Memorandum at issue in *Center for Effective Government*, 7 F. Supp. 3d 16, upon which Plaintiff relies extensively. *See* Pl.'s Opp. 14. That post-decisional Presidential Memorandum had been "distributed widely within the Executive Branch for non-advisory purposes." *Center for Effective Government*, 7 F. Supp. 3d at 27. Here, Defendants have established that the President solicited the strategic plans and Ambassador Rice used the plans to advise the President. Plaintiff does not suggest that the strategic plans submitted to the White House have been further distributed beyond the President's advisors. Moreover, the Presidential Memorandum in *Center for Effective Government* was a final presidential action that carried the force of law. *Id.* at 28. Here, as explained above, the strategic plans informed, and continue to inform, the President's non-final decisionmaking about voting matters and, even to the extent that they included information about existing agency actions, the

plans *themselves* do not determine any legal obligations, unlike the directive in *Center for Effective Government*.

**IV.    Disclosing the Strategic Plans Would Impair the Presidential Decisionmaking Process**

The President solicited the strategic plans to assist in his decisionmaking about the Administration's priorities for voting matters, which fits neatly with the purpose of the presidential communications privilege to "preserve[] the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially[.]"  *Loving*, 550 F.3d at 37 (citations omitted).  As Defendants explained, disclosing the strategic plans would cause clear foreseeable harm by impairing that presidential decisionmaking process.  Defs.' Mot. 8–10.

Plaintiff ignores this court's recent decision upholding the government's determination of foreseeable harm in the context of the presidential communications privilege.  *See* Defs.' Mot. 9 (quoting *Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622 (ABJ), 2021 WL 4502106, at *23 (D.D.C. Sept. 30, 2021)).  In *Washington Post*, the Court determined that "disclosure [of information withheld under the presidential communications privilege] 'burden[s] the ability of the President and his advisors to engage in a confidential and frank decision-making process and chill[s] or inhibit[s] their ability to have candid discussions, thus impacting the efficiency of government policy-making.'"  *Id.* (citing agency declaration).  Mr. Sauber similarly averred that "the President must be able to receive confidential advice of all kinds" and that "[i]f such communications are forced to be disclosed . . . [c]andid discussions will naturally be chilled or inhibited, and the efficiency of government policymaking would suffer."  Sauber Decl. ¶ 13.  "[I]n the context of the presidential communication privilege, this is sufficient."  *Wash. Post*, 2021 WL 4502106, at *23 (citing *Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020).

Plaintiff draws an irrelevant distinction between "advice" from agencies and information about "actions" they have or will take. Pl.'s Opp. 19–20. Even purely factual information about an agency's experience or intended course of action informs the President and his close advisors as his Administration considers policies for voting matters. The D.C. Circuit, therefore, has held that the presidential communications privilege protects the President's ability to obtain "full knowledge" of government affairs, which is an important way in which the privilege sweeps more broadly than the deliberative process privilege. *See In re Sealed Case*, 121 F.3d at 750; *see also id.* at 745 ("post-decisional materials" "often will be revelatory of the President's deliberations."). Far from relying on only "boilerplate," *contra* Pl.'s Opp. 18, Mr. Sauber connects that principle to the facts of this case: in the context of "obtain[ing] frank, unfettered information . . . on important policy issues such as voting access," "[t]he quality of the presidential decisionmaking process would be damaged if Defendants cannot focus solely on providing comprehensive and candid information to the White House." Sauber Decl. ¶ 14. In any event, the focus of Plaintiff's public interest argument—the public interest in understanding government operations—is served without the release of the strategic plans, because FOIA obligates agencies that take final agency actions to release records about those actions to the public, without the attendant risk of confusion that comes with comingling those records with proposed but unenacted policies throughout the strategic plans. *See* Defs.' Mot. 10.

## CONCLUSION

For these reasons, this Court should grant Defendants' motion for summary judgment.

Dated:  May 12, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD
Trial Attorney (ME Bar No. 006018)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 305-7667
Fax:  (202) 616-8470
E-mail:  brian.c.rosen-shaud@usdoj.gov

*Counsel for Defendants*